# In the United States Court of Federal Claims

BID PROTEST
No. 19-685C
(Filed Under Seal: August 12, 2019 | Reissued: August 27, 2019)[*]

|  |  |
|---|---|
| TRAX INTERNATIONAL CORPORATION,<br><br>     Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>     Defendant, | Keywords: Standing; Prejudice; Pre-Award Protest; FAR 15.206(a); Procurement Integrity Act; Substantial Chance; Non-Trivial Competitive Injury. |

*Amy L. O'Sullivan*, Crowell & Moring LLP, Washington, DC, for Plaintiff. *James G. Peyster*, *Olivia L. Lynch*, *Stephanie L. Crawford*, and *G. Meredith Parnell*, Crowell & Moring LLP, Washington, DC, Of Counsel.

*Eric P. Bruskin*, Senior Trial Counsel, Civil Division, U.S. Department of Justice, Washington, DC, for Defendant, with whom were *Douglas K. Mickle*, Assistant Director, *Robert E. Kirschman, Jr.*, Director, *Joseph H. Hunt*, Assistant Attorney General. *Harry Parent*, Trial Attorney, Contract and Fiscal Law Division, U.S. Army Legal Services Agency, Fort Belvoir, VA and *Andrew J. Smith*, Lieutenant Colonel, Judge Advocate, Branch Team Chief & Trial Attorney, Contract and Fiscal Law Division, U.S. Army Legal Services Agency, Fort Belvoir, VA, Of Counsel.

---

[*] This opinion was originally issued under seal and the parties were given the opportunity to request redactions. The opinion is now reissued with redactions noted in brackets. The Court notes that it declines to redact the name of a declarant that TRAX requested be hidden from public view. TRAX has not identified <u>any</u> reason why the individual's name should not be disclosed, much less a basis sufficient to overcome the "presumption of public access to judicial records." <u>Baystate Techs., Inc. v. Bowers</u>, 283 F. App'x 808, 810 (Fed. Cir. 2008); see also <u>Does I Thru XXIII v. Advanced Textile Corp.</u>, 214 F.3d 1058, 1068–69 (9th Cir. 2000) (setting forth factors for courts to consider in balancing a party's interest in anonymity with public interest in disclosure).

# OPINION AND ORDER

**KAPLAN, Judge.**

Plaintiff TRAX International Corporation ("TRAX") was excluded from a competition to supply the Department of the Army ("the Army" or "the agency") with mission support services at the White Sands Missile Range ("WSMR" or "the Range"). The Army found the proposal technically unacceptable because of what the agency viewed as its excessive reliance for contract performance on a part-time workforce that would receive no fringe benefits.

TRAX, the incumbent contractor, contends that the Army's decision was arbitrary, capricious, and contrary to law. Specifically, it argues that—in violation of FAR 15.206(a)—the Army failed to amend the solicitation to reflect changes in what it alleges was the Army's forecast regarding the number of labor hours that would be required to perform the contract. Second, TRAX contends that the agency did not perform a reasonable and complete investigation of an alleged Procurement Integrity Act ("PIA") violation.

Currently before the Court are the parties' cross-motions for judgment on the administrative record, as well as the government's motions to strike and TRAX's motion to supplement the administrative record. For the reasons that follow, the Court concludes that TRAX has not established its standing to bring either of the two claims pressed in its complaint. Accordingly, the complaint is **DISMISSED without prejudice**; TRAX's motion for judgment on the administrative record is **DENIED**; and the government's cross-motion is **DENIED as moot**. TRAX's motion to supplement the administrative record and the government's motion to strike documents attached to TRAX's complaint and MJAR are both **GRANTED-IN-PART and DENIED-IN-PART**. Finally, the government's motion to strike documents attached to TRAX's reply in support of its MJAR is **GRANTED**.

## BACKGROUND

**I.      The Solicitation**

The White Sands Missile Range is the Department of Defense's "largest open-air land test range." Administrative Record ("AR") Tab 1a at 191. It was established "to provide for the operation of an integrated guided missile range under the command, management, and operational responsibility of the Army." Id. The Range, which is located in New Mexico, "possesses extensive capabilities and infrastructure utilized by the Army, Navy, Air Force, NASA and other government agencies as well as universities, private industry and foreign militaries." Id. at 191–92. It "supports National Security interests by providing the warfighter with data collection and analysis, instrumentation development, modeling and simulation, research, assessment, and technical services." Id. at 191.

TRAX is the incumbent Mission Support Services ("MSS") contractor at the Range. In anticipation of the expiration of its contract with TRAX, on March 30, 2018 the Army issued Solicitation No. W91151-18-R-0005 ("the Solicitation"). AR Tab 1 at 1. The Solicitation requested proposals to perform a wide variety of "non-personal services to support the planning, logistics, operation, maintenance, research, and development of systems, equipment, and

facilities for the WSMR [Test and Evaluation] mission." AR Tab 1a at 192. It contemplated the award of a "cost plus fixed fee term contract." AR Tab 1 at 79; see also id. at 65.

Under the Solicitation, the Army would determine best value on the basis of four factors: (1) "Mission Capability"; (2) "Past Performance"; (3) "Small Business Participation"; and (4) "Cost." Id. at 81–82. The Mission Capability factor was "significantly more important" than Past Performance, while Past Performance was equal to Small Business Participation. Id. at 83. The combined "non-cost factors"—i.e., Mission Capability, Past Performance, and Small Business Participation—were "significantly more important" than Cost. Id. at 82.

The "Mission Capability" factor, which is the focus of this protest, was comprised of three subfactors: "Program Management"; "Cost Management"; and "Recruitment and Retention of Technical Expertise." Id. at 81. Under the Solicitation, if a proposal was assigned a "Marginal" or "Unacceptable" rating under any of these subfactors, then the Mission Capability factor as a whole would receive the same rating and the offeror would be ineligible for award. Id. at 83.

Of particular relevance to the present protest is Exhibit T to the Solicitation. Exhibit T is a ten-page document that lists the "total hours" of work for employees occupying several hundred labor categories during the base and option years of the contract. AR Tab 1a at 914–23. The hours for each labor category are listed on a CLIN-by-CLIN basis reflecting the cost of services for the clients to which they pertain. Id.

The hours reflected in Exhibit T are based on historical data. Aug. 1, 2019 Hr'g ("Hr'g") at 3:11:54–12:05. One of the central issues on the merits in this case is whether—as TRAX argues—the historical data reflected the agency's forecast of the number of labor hours that would be required to perform under the new contract. According to the agency, the purpose of Exhibit T was simply to provide a baseline against which to evaluate the offerors' cost proposals, and it was never intended to be treated as a prediction of the hours required for future performance, which would vary based on budget and other factors.

The Solicitation's instructions for proposing costs reference the "staffing information and total hours in Exhibit T by labor category," and direct offerors to use them "as a baseline for developing proposed labor costs." AR Tab 1 at 79. Offerors were also instructed that they "shall not deviate from the baseline staffing in Exhibit T except as instructed . . . to account for lead workers and straight overtime." Id.

## II. TRAX's Proposal

After five Solicitation amendments, the Army received timely proposals from six offerors, including TRAX, which submitted its proposal on May 14, 2018. AR Tabs 2–6, 11. On August 21, 2018, the contracting officer ("CO") sent TRAX three letters raising concerns (i.e., "perceived weaknesses, errors, omissions, or mistakes") regarding its proposal in accordance with FAR 15.306(b) (entitled "Communications with offerors before establishment of the competitive range"). See generally AR Tabs 14a, 14b, 14c. The concerns expressed involved two related aspects of TRAX's proposal: (1) its plan to use a predominantly part-time workforce to

3

provide services under the contract; and (2) its projection of drastic reductions in the amount of overtime work that would be needed to perform the contract. Id. at 6136–43.

Specifically, TRAX had proposed that—as a cost-cutting measure—slightly over [***] percent of the workforce it employed would be part-time workers who would not be eligible for certain fringe benefits, such as holiday and vacation pay. See AR Tab 11b at 5432–35; AR Tab 14a at 6136. In addition, TRAX's proposal contemplated that it would need to assign work on an overtime basis at a tiny fraction of the Army's historic rates. AR Tab 11b at 5435–36; AR Tab 14c at 6141–42.

In one of the three letters, the Army expressed "a concern about the proposed fringe benefits for part time (PT) employees and the impact it will have on retaining qualified personnel." AR Tab 14a at 6136. In another, the Army stated a concern that TRAX's proposal not to provide vacation time, paid holidays, or sick leave for part-time employees might violate Federal Acquisition Regulation clauses, Executive Orders, and provisions of the governing collective bargaining agreement. AR Tab 14b at 6138–40. In the third letter, the Army requested that TRAX confirm that its proposal contemplated the use of only [***]%, or [***] hours, of overtime notwithstanding that "historical overtime usage for this requirement are 378,998 hours." AR Tab 14c at 6142. It also asked TRAX to specify where in its proposal it had explained its "methodology" for achieving "quick reaction capability to meet last-minute mission changes and requirements" with such a drastic reduction in historical overtime hours. Id.

On August 23, 2018, TRAX responded to each of the three letters. See generally AR Tabs 15a, 15b, 15c. TRAX affirmed that it intended to propose a [***] percent to [***] percent part-time/full-time workforce ratio. AR Tab 15a at 6144. In addition, it provided a cost-cutting rationale as the basis for its strategy, and responded to the Army's questions regarding the fringe-benefit eligibility of its proposed workforce. Id. at 6144–50; AR Tab 15b at 6151–54. Finally, in response to the CO's third letter, TRAX challenged the Army's suggestion that the number of overtime hours performed under prior contracts was pertinent to the work to be performed under the new contract. AR Tab 15c at 6155. It further stated that its use of part-time employees would be "an enabler for reducing overtime utilization" and that it would provide "an extremely efficient workforce," which was "a key element" of its "cost management approach." Id. at 6156.

### III. The SSEB's Report

On September 12, 2018, the Source Selection Evaluation Board ("SSEB") submitted a Report and competitive range recommendation to the Source Selection Authority ("SSA"). AR Tab 16 at 6160–203. The SSEB observed in its Report that TRAX's proposal specified that it intended to hire "100% of the incumbent employees" so that it could provide "a trained workforce" and also "minimize interruptions or delays to work in progress that would impact the mission." Id. at 6183. But "[w]hile the plan emphasized hiring/retaining 100% of the incumbent workforce," the SSEB noted, "the information provided by [TRAX] revealed the conversion of [***]% of the workforce to Part-time employees with no fringe benefits." Id. The SSEB was "great[ly] concern[ed]" about TRAX's ability "to retain highly skilled trained employees on a part time basis with no fringe benefits on day one of transition"; indeed it observed that there was what it called "a real possibility of a union strike in the short term." Id. "Furthermore," the SSEB opined, "there is a realistic possibility of disgruntled part-time employees having a

4

negative impact on mission operations and the government expects there to be erosion of the highly trained and skilled part time work force that the Offeror was able to convert over time." Id.

The SSEB also found TRAX's overtime projections "perplexing." Id. at 6199. "As the incumbent," the SSEB observed, TRAX "should clearly understand the requirement but their deliberate plan appears unrealistic." Id. Noting that overtime is typically "beyond the control of the contractor," the SSEB explained that TRAX would "need to provide additional rationale on how they [would] overcome the external factors discussed herein with their OT projections." Id. In light of its concerns, the Army made a significant upward probable cost adjustment to TRAX's proposal to reflect realistic overtime levels based on historical rates of overtime usage. Id.; see also AR Tab 26c.3 at 7865–72 (Exhibit AL – Historical Overtime Data).

### IV. TRAX Is Eliminated from the Competition

On September 18, 2018, the SSA made his competitive range determination. The SSA excluded three offerors from the competitive range, including TRAX. AR Tab 17 at 6204–21.

The Army notified TRAX of its exclusion on the same day. AR Tab 18 at 6222–23. It explained that—consistent with the evaluation factors set forth in the Solicitation—it had found TRAX ineligible for award because it had been assigned a "Marginal" rating in the "Program Management" and "Recruitment and Retention of Technical Expertise" subfactors and an "Unacceptable" rating in the "Continuity of Operations" subfactor of the Mission Capability factor. Id. at 6222. The Army advised TRAX that its proposal to employ a workforce [***] percent of whom would be part-time employees presented "an appreciable risk for the Government with respect to TRAX's ability to retain both qualified and trained personnel being asked to convert from full time to part time with no fringe benefits." Id. The Army further noted that TRAX's "proposal did not identify the transition of [***]% of the workforce from full time to part time with no fringe benefits as a risk" and that "[t]here was no risk evaluation or mitigation for the implementation of this strategy in the proposal." Id. at 6223. In the Army's view, "[t]he conversion of [***]% of the workforce to Part-time status with no fringe benefits raise[d] the risk of unsuccessful contract performance during the transition period to an unacceptable level." Id.

On September 24, 2018, the Army sent TRAX a debriefing letter which contained a detailed explanation of the evaluation of its proposal. AR Tab 19 at 6224–27. In a September 26, 2018 letter, TRAX posed a series of questions regarding the matters covered in the debriefing letter. AR Tab 20 at 6228–30. The CO responded by letter dated September 28, 2018. AR Tab 21 at 6231–34.

### V. TRAX's GAO Protest

TRAX filed its first bid protest with GAO on October 3, 2018. AR Tab 23. In that protest, TRAX challenged as unreasonable, arbitrary, and capricious the Army's decision to exclude it from the competitive range based on its proposal to use a predominantly part-time workforce. Id. at 6244, 6262–63, 6278.

5

GAO denied the protest on January 9, 2019. AR Tab 30 at 9385. It concluded that it was reasonable for the Army to find TRAX's proposal technically unacceptable because of the perceived risk presented by the proposal's heavy reliance upon a part-time workforce that would not receive fringe benefits. Id. at 9387–91. In particular, GAO agreed that it was reasonable for the Army to question whether TRAX could meet its stated goal of retaining one hundred percent of its incumbent workforce if it converted such a substantial portion of that workforce to part-time or temporary employment. Id. at 9388–89. GAO further rejected as inconsistent with the record TRAX's argument that was misled by the Solicitation into believing that it would be required to use a largely part-time workforce. Id. at 9389–90 (noting that in its FAR 15.306(b) response letter TRAX had acknowledged that there was no specified Government requirement to use part-time or full-time employees and that it had "elected to use the 'part-time' resource to save money and reduce slack time between tests") (quoting AR Tab 15a at 6146).

## VI. Confidential and Proprietary TRAX Information Appears on the Z-Drive

In the meantime, on December 21, 2018, while its initial GAO protest was pending, TRAX became aware that some of its confidential and proprietary documents had been uploaded onto the WSMR Z-Drive. Pl.'s Mot. for J. on the Admin. R. ("Pl.'s MJAR") at 9, ECF No. 19. That drive contains documents that are relevant to WSMR operations and the WSMR MSS contract. AR Tab 46c at 9698. Its contents are not accessible by the public, but other contractor personnel may secure access with the government's permission. Id.; AR Tab 31 at 9392. As TRAX later discovered, the documents uploaded to the Z-Drive included its Fiscal Year 2019 Contractor Rates, position descriptions, organizational charts, and other confidential materials related to its incumbent contract. Pl.'s MJAR at 9–10; see also AR Tab 31 at 9392.

On January 4, 2019, TRAX submitted a PIA notice to Peter Hopkins, the CO on its current contract, and Worner Heath, the Procurement Contracting Officer ("PCO") for the pending recompete. AR Tab 31 at 9392–93. In the notice, TRAX asked the Army to remove all of its proprietary information from the Z-Drive and investigate whether a PIA violation had occurred. Id. at 9393. TRAX also requested that the Army "take appropriate corrective action to remedy any such violation" that had "any impact on the pending competition." Id.

On January 7, 2019, TRAX Project Manager David Soules informed Mr. Hopkins that the proprietary TRAX information was contained in the "Contract Functional Review" and "Resume" subfolders of the "Accounting" folder on the Z-Drive. AR Tab 46c at 9696; AR Tab 41c at 9589; see also AR Tab 38a at 9536. Mr. Hopkins located the folder and subfolders and determined that they belonged to Dawn Way, the Resource Management Director for the WSMR Finance and Accounting Directorate. AR Tab 41c at 9590.

Ms. Way acknowledged that she had uploaded the confidential and proprietary information onto the Z-Drive for a briefing in late November or early December of 2018. AR Tab 33 at 9395. After she learned that TRAX had filed a PIA notice, Ms. Way moved the entire Accounting folder, which contained 6,600 files, from the Z-Drive to her assigned laptop's desktop. AR Tab 41c at 9592–93; AR Tab 46c at 9698. She showed Mr. Hopkins the relocated files and explained that she had removed them from the Z-Drive "[i]n order to immediately address the [PIA] concern while still preserving the information in question." AR Tab 41c at 9592–93. Ms. Way told Mr. Hopkins that she had determined that out of the 6,600 files in the

6

Accounting folder, only twenty-nine documents in the "Contract Functional Review" subfolder contained TRAX information. AR Tab 46c at 9696–97. Ms. Way and Mr. Hopkins then reviewed the twenty-nine documents together and Ms. Way explained their substance to Mr. Hopkins. AR Tab 41c at 9590, 9593.

On January 9 or 10, Mr. Heath held a telephone conference with Mr. Hopkins, Ms. Way, WSMR legal counsel, Contract Management Division Chief Tim Byrnes, and two WSMR IT/Z-Drive experts. AR Tab 33 at 9395; AR Tab 41c at 9590, 9594. Ms. Way told the participants on the call that she had uploaded the TRAX proprietary information to the Z-Drive, that this was not her general practice, and that she had removed the information from the Z-Drive and transferred it to her computer. AR Tab 33 at 9395; AR Tab 41c at 9592–93. Ms. Way gave the team investigating the PIA notice access to her computer. AR Tab 41c at 9594.

Mr. Heath interviewed the technical team for the procurement. Each of the five team members stated that they did not upload proposal data for the Solicitation to the Z-Drive. AR Tab 41b at 9576. IT recovered backups of the folders and files, which according to the government, "confirmed the contents of those folders." AR Tab 41c at 9590. After he reviewed the files, Mr. Hopkins determined that the information they contained was "not part of the solicitation," but rather "pertain[ed] to the administration of the current contract." Id. at 9582.

On January 15, 2019, Mr. Heath issued a memorandum stating his conclusion that the alleged PIA violation had "no impact whatsoever on the pending award of the contract" under the Solicitation. AR Tab 33 at 9396. Two days later, he sent TRAX's counsel a letter regarding the Army's finding. AR Tab 34 at 9397. Specifically, the letter stated that "[a] scan of the Z-Drive revealed no evidence of source selection sensitive information" and "[s]ource selection . . . was done in the Acquisition Source Selection Interactive Support Tool (ASSIST). . . . There was no evidence that anyone with access to both ASSIST and the Z-Drive violated protocol by uploading source selection sensitive information onto the Z-Drive." Id.

**VII.  TRAX's Second and Supplemental GAO Protests**

TRAX filed its second GAO protest on January 22, 2019. AR Tab 36. TRAX argued that the Army's January 2019 PIA determination was irrational and unsupported, and that its PIA investigation was unreasonable and inadequate. Id. at 9408–14. The Army submitted a request for dismissal on January 30, 2019 and a legal memorandum to GAO on February 21, 2019. AR Tabs 37, 41. TRAX then submitted a supplemental protest on March 4, 2019, alleging "a litany of additional errors and omissions" in the Army's PIA investigation. AR Tab 42 at 9595. In response, the Army submitted a supplemental legal memorandum on March 12, 2019. AR Tab 46.

On May 2, 2019, GAO denied TRAX's second and supplemental protests. AR Tab 48. GAO found reasonable the Army's determination that the alleged PIA violation had no impact on the competition. Id. at 9834–41. GAO also found that the Army adequately investigated the potential PIA violation. Id. at 9837–38, 9840–41.

**VIII.    This Action**

On May 8, 2019, TRAX filed the present bid protest in this court. Compl., ECF No. 1. It consists of two claims. First, TRAX alleges that the Army violated FAR 15.206(a) when it failed to amend the Solicitation to reflect Army decisions to significantly reduce the labor-hour and staffing requirements for the new contract, which it claims were made some time after TRAX submitted its proposal. Id. ¶¶ 2; 34–45. TRAX contends that its elimination from the competitive range was arbitrary and capricious and without any rational basis because it was "based on both a[n] RFP and an evaluation that were inconsistent with the Agency's requirements." Id. at 37. Second, TRAX alleges that the Army "failed to perform a reasonable and adequate investigation in response to TRAX's notice of a PIA violation." Id.

TRAX seeks injunctive relief requiring the Army to: (1) amend the Solicitation to reflect the Army's current and/or projected requirements and request revised proposals from all offerors who submitted proposals in response to the Solicitation; (2) conduct a reasonable and complete PIA investigation in compliance with statutory and regulatory obligations; and (3) not proceed with performance of a contract awarded—or to not award a contract if an award has not yet been made—based either on the current Solicitation requirements that allegedly violate FAR 15.206(a) or before the completion of a fully compliant PIA investigation that finds no violation or impact on the procurement transpired. Id. at 37–38.

The government filed the administrative record on May 23, 2019. On June 6, 2019, TRAX filed its MJAR. ECF No. 19. The government filed its own MJAR, along with a motion to strike all references to extra-record documents in TRAX's MJAR, on June 20, 2019. ECF No. 20. The cross-motions have been fully briefed. ECF Nos. 23, 26. TRAX filed a motion to compel completion and/or supplementation of the administrative record on July 16, 2019, to which the government responded on July 26. ECF Nos. 25, 28. The government also moved to strike the documents attached to TRAX's reply in support of its MJAR. ECF No. 28. The Court held oral argument on August 1, 2019.

**DISCUSSION**

**I.    The Parties' Motions Regarding Extra-Record Documents**

As mentioned above, TRAX has sought to supplement and/or complete the administrative record with certain additional documents, and the government has moved to strike the same documents from TRAX's submissions to the Court. The documents at issue are: (1) the declaration of TRAX Program Manager David Soules attached to TRAX's complaint as Exhibit 20 ("the Soules Declaration"); (2) Exhibits 1–3 to TRAX's MJAR, which all pertain to TRAX's MSS bridge contract; (3) Exhibit 4 to TRAX's MJAR, characterized by TRAX as "an email exchange between counsel regarding the scope of the Administrative Record," Pl.'s Mot. to Compel Completion and/or Supplementation of the Admin. R. & Resp. to Mot. to Strike ("Pl.'s Suppl. Mot.") at 2, ECF No. 25; and (4) four exhibits attached to TRAX's reply to support its position that the agency's requirements changed after TRAX submitted its proposal.

The Court finds that certain portions of the Soules Declaration may be considered for purposes of determining standing and therefore may be included in the Court's record. It will

8

also consider the email correspondence between counsel regarding the scope of the administrative record as part of the record of the case, as the government does not object to such consideration. In contrast, the remaining documents proffered by TRAX are not necessary for judicial review. Thus, the Court rejects TRAX's argument that the remaining documents should be added to the administrative record. Accordingly, the parties' motions regarding extra-record materials are **GRANTED-IN-PART** and **DENIED-IN-PART**, as further explained below.

### A. The Soules Declaration

TRAX seeks inclusion of the Soules Declaration in the record on the grounds that: (1) certain portions of the Declaration support its argument that the agency's requirements changed after the proposal was submitted; 2) paragraph 10 addresses the prejudice to TRAX resulting from the agency's failure to amend the Solicitation; and 3) paragraphs 11–16 address the showing of harm required of TRAX to demonstrate its entitlement to injunctive relief. Pl.'s Suppl. Mot. at 11–12. The government does not object to the Court's consideration of paragraphs 1–4 and 11–16 for the purposes of considering injunctive relief. Def.'s Mot. to Strike & Resp. to Pl.'s Suppl. Mot. ("Def.'s Suppl. Resp.") at 7 n.2, ECF No. 28.

"[E]vidence going to prejudice or prospective relief, if not found in the administrative record, may nonetheless be considered as part of the court's record." State of N.C. Bus. Enters. Program v. United States, 110 Fed. Cl. 354, 362 (2013) (citing East West, Inc. v. United States, 100 Fed. Cl. 53, 57 (2011)). The Court, therefore, finds that it may properly consider paragraphs 1–4 and 10–16 of the Soules Declaration as part of its record for prejudice and injunctive-relief purposes. TRAX's motion to supplement is granted to this extent.

As to the other portions of the Declaration, the Court declines to supplement either its record or the administrative record because the information is not necessary for "effective judicial review." See Axiom Res. Mgmt., Inc. v. United States, 564 F.3d 1374, 1380 (Fed. Cir. 2009) ("[S]upplementation of the record should be limited to cases in which the omission of extra-record evidence precludes effective judicial review.") (internal quotation marks and citations omitted). These paragraphs contain assertions regarding what Mr. Soules alleges are the agency's current and projected estimates of the staffing needed to perform the contract and his "understanding" that the agency is engaged in "an ongoing effort to reduce contractor personnel at WSMR." Compl., Ex. 20 ("Soules Decl.") ¶¶ 6, 9, ECF No. 1-1. The assertions regarding current and projected needs are not relevant in light of the Court's conclusion, described in detail below, that TRAX lacks standing to challenge any alleged change in agency requirements that occurred after its proposal was eliminated from the competition. TRAX's motion to supplement is denied in this respect.

### B. Exhibits 1–3 to TRAX's MJAR

The documents submitted as Exhibits 1–3 to TRAX's MJAR are all related to the bridge contract the parties executed to provide the government with services while this protest is pending. Pl.'s Suppl. Mot. at 6–7. TRAX maintains that these documents "reflect[] major requirements changes that have already occurred since the issuance of the [Solicitation]." Id. at 8. These documents all appear to have been created in the spring of 2019 for the purpose of preparing a three-month contract extension from June 1, 2019 through August 31, 2019. See Pl.'s

9

MJAR, Exs. 1–3, at 2–32, ECF No. 19-1.[1] Thus, they do not contravene the Court's conclusion that, accepting as true the allegation that the requirements changed, the obligation to amend the Solicitation was not triggered before TRAX's elimination from the competition on September 18, 2018. Accordingly, these documents are not necessary for effective judicial review and the Court denies TRAX's request to add them to the administrative record.

### C. Exhibit 4 to TRAX's MJAR

The government does not oppose TRAX's request that the Court treat Exhibit 4 to TRAX's MJAR, an email between the parties regarding the contents of the administrative record, as part of the "record of the case." Def.'s Suppl. Resp. at 10 n.5 (citing Pl.'s Suppl. Mot. at 13–14). Because the parties agree that the Court may properly consider Exhibit 4 as part of the record of the case, the Court grants that request.[2]

### D. Exhibits 1–4 to TRAX's Reply in Support of Its MJAR

The government contends that any changes in contract requirements occurred either too early or too late for TRAX to successfully protest the agency's failure to amend the Solicitation, for reasons related to waiver and standing. In response, TRAX included four exhibits with its reply to support its argument that the alleged changes "commenced" in the summer of 2018, before its exclusion from the competitive range. Pl.'s Suppl. Mot. at 9–10. The documents consist of "three examples of documentation of e-mail correspondence between TRAX employees and Army personnel and one resignation notice." Id. at 9. The Court finds these documents unnecessary for effective judicial review for three reasons.

First, as explained in detail below, the Court rejects TRAX's incremental change argument—which is directly tied to the subject documents—on its face. In failing to identify the point at which the agency's obligation to amend was triggered, TRAX has not carried its burden to establish standing. The Court need not consider these supporting documents because it has concluded that the related legal theory is faulty. Second, the Court has determined that several documents in the existing administrative record show that any final decisions regarding the Fiscal Year 2019 budget and related staffing levels were not finalized until after TRAX was eliminated from the procurement. In light of that conclusion, documents from the summer of 2018 only reflect—at the most—deliberations, and cannot overcome the existing record evidence.

Finally, the Court has also found that one reason that TRAX was not prejudiced by the agency's failure to amend the Solicitation is that it has not demonstrated that, had the Army done

---

[1] The page numbers cited are taken from the ECF header added to the documents upon filing.

[2] The parties also concur that Exhibits 5 and 6 to TRAX's MJAR reproduce portions of the existing administrative record. Pl.'s Supp. Mot at 13–14; Def.'s Suppl. Resp. at 10 n.5. There is therefore no need for the Court to formally add them to either the administrative record or its own record of the case.

so, TRAX would have submitted a proposal that lacked the deficiencies which led to its elimination. This basis for the Court's disposition of TRAX's FAR 15.206(a) claim does not depend on the timing of the purported changes to the contract's staffing requirements. Documents submitted to establish that timing, therefore, are irrelevant to this aspect of the Court's reasoning and need not be included in the record.

For these reasons, the four documents attached to TRAX's reply in support of its MJAR are not needed for effective judicial review. The Court therefore denies TRAX's request that it consider these documents as part of the administrative record.

## II. TRAX Lacks Standing to Pursue Its Claim Under FAR 15.206(a)

FAR 15.206(a) states that "[w]hen, either before or after receipt of proposals, the Government changes its requirements or terms and conditions, the contracting officer shall amend the solicitation." TRAX contends that the Solicitation in this case established "a mandatory staffing level of 505 FTEs and a full slate of PWS requirements to support WMSR's testing efforts" but that these requirements have since been changed. Pl.'s MJAR at 17. Specifically, TRAX argues that "the Army has made affirmative decisions to dramatically cut the WSMR MSS staffing levels and scope of work in large part through the implementation of insourcing decisions, transfers of personnel to other contracts, and deliberate staffing level reductions driven by budgetary-based reductions." Id. It contends that instead of the 505 FTEs reflected in Exhibit T, "the reasonable range in required staffing levels is between 343 FTEs (based on the current WSMR MSS contract) and 174 FTEs (based on the Army's stated needs today)." Id. Because of these changes, TRAX argues, the Army was required to amend the Solicitation to more accurately reflect its requirements under FAR 15.206(a). Id.

For the reasons set forth below, TRAX has failed to establish that it is an "interested party" under 28 U.S.C. § 1491(b) with standing to pursue its claim. Therefore, the claim must be dismissed.

### A. **Governing Principles**

The Court of Federal Claims has jurisdiction over bid protests in accordance with the Tucker Act, 28 U.S.C. § 1491, as amended by Section 12 of the Administrative Dispute Resolution Act of 1996, 28 U.S.C. § 1491(b). Specifically, the Court has the authority "to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1); see also Sys. Application & Techs., Inc. v. United States, 691 F.3d 1374, 1380–81 (Fed. Cir. 2012) (observing that § 1491(b)(1) "grants jurisdiction over objections to a solicitation, objections to a proposed award, objections to an award, and objections related to a statutory or regulatory violation so long as these objections are in connection with a procurement or proposed procurement").

"The party invoking federal jurisdiction bears the burden of establishing standing." CliniComp Int'l, Inc. v. United States, 904 F.3d 1353, 1358 (Fed. Cir. 2018) (citing Myers Investigative & Sec. Servs., Inc. v. United States, 275 F.3d 1366, 1369 (Fed. Cir. 2002) (citing

11

Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992))). In the context of a bid protest, "a plaintiff must make two showings" to meet this burden. Id.

First, a plaintiff must show that it is an "interested party," i.e., "an actual or prospective bidder" with a "direct economic interest" in the procurement or proposed procurement. Id.; see also Sys. Application & Techs., Inc., 691 F.3d at 1382 (citing Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1359 (Fed. Cir. 2009)); Orion Tech., Inc. v. United States, 704 F.3d 1344, 1348 (Fed. Cir. 2013). Generally, "[t]o prove a direct economic interest, an actual or prospective bidder must show that it had a substantial chance of winning the contract." Diaz v. United States, 853 F.3d 1355, 1358 (quoting Digitalis Educ. Sols., Inc. v. United States, 664 F.3d 1380, 1384) (Fed. Cir. 2012)); see also CliniComp, 904 F.3d at 1358 (quoting Diaz and Digitalis for the same proposition). The court of appeals, however, has recognized an exception to that general standard "when a prospective bidder challenges the terms of the solicitation itself, prior to actually submitting a bid." Orion Tech., Inc., 704 F.3d at 1348 (Fed. Cir. 2013); see also Weeks Marine, 575 F.3d at 1361–62. In such circumstances, because "there is a lack of a bid or other factual basis to evaluate a protestor's chance at an award," a showing of a "non-trivial competitive injury" will suffice to establish the requisite direct economic interest. Veteran Shredding, LLC v. United States, 140 Fed. Cl. 759, 764 (2018).

The second showing that a plaintiff must make to establish its standing is "that it was prejudiced by a significant error in the procurement process." CliniComp, 904 F.3d at 1358 (citing Diaz, 853 F.3d at 1358) (additional citations omitted). Specifically, the plaintiff must "show that but for the error, it would have had a substantial chance of securing the contract." Id. (quoting Labatt Food Serv., Inc. v. United States, 577 F.3d 1375, 1378 (Fed. Cir. 2009)) (emphasis added in CliniComp).[3] Determining whether prejudice has been shown for purposes of establishing a plaintiff's standing requires the court to engage in a factual analysis. Labatt, 577 F.3d at 1379; see also CliniComp, 904 F.3d at 1359.

As the court of appeals has noted, "[a]lthough the inquiries may be similar, prejudice must be shown either as part of, or in addition to, showing a direct economic interest." CliniComp, 904 F.3d at 1358. Courts should not "conflat[e] the standing requirements of prejudicial error and economic interest," because doing so would mean that "there would be no such thing as an error non-prejudicial to an economically interested offeror in a bid contest." Labatt, 577 F.3d at 1380. Therefore, the question of prejudice may not be delayed until after the merits analysis but "must be reached before addressing the merits." Id. at 1378–79 (quoting Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir. 2003)).[4]

---

[3] In post-evaluation, pre-award protests like this one, a plaintiff may satisfy the substantial chance test by showing it "could have likely competed for the contract" but for the alleged error. See, e.g., KSC Boss Alliance, LLC v. United States, 142 Fed. Cl. 368, 379 (2019) (quoting Orion Tech., 704 F.3d at 1348–49).

[4] Although relevant case law is somewhat unclear as to whether the "substantial chance" test is used to determine direct economic interest, prejudice, or both, it is clear in any event that "a party cannot be prejudiced unless it first has a substantial chance of award." Veteran Shredding,

B. **Application of Principles**

As noted above, to establish its standing, a plaintiff must show that it is "an actual or prospective bidder" (or offeror) with a "direct economic interest" in the procurement, and that it was prejudiced by a significant error in the procurement process. TRAX was an actual offeror on the Solicitation. Nonetheless, it lacks standing because it has failed to establish that it was prejudiced by the agency's alleged violation of FAR 15.206(a). Specifically, TRAX has failed to show, as a matter of fact, that but for the agency's failure to amend the Solicitation to provide what TRAX alleges is a more accurate reflection of its requirements, TRAX would have had a substantial chance of securing the contract.[5]

First, TRAX has failed to show that the agency had an obligation to amend the Solicitation <u>before</u> September 18, 2018, the day TRAX was eliminated from the competition. This failure of proof is fatal to TRAX's standing because it would not have been entitled to submit a new proposal in response to an amendment issued after its elimination from the competition. <u>See</u> FAR 15.206(c) ("Amendments issued after the established time and date for receipt of proposals shall be issued to all offerors that have not been eliminated from the competition."). And because it would not have been entitled to submit a new proposal in

---

140 Fed. Cl. at 765; <u>see also</u> <u>CliniComp</u>, 904 F.3d at 1358 (applying substantial chance test to both direct economic interest and prejudice); <u>Labatt</u>, 577 F.3d at 1378 ("A party has been prejudiced when it can show that but for the error, it would have had a substantial chance of securing the contract."); <u>Weeks Marine</u>, 575 F.3d at 1359 (stating two conditions for standing are that the plaintiff "(1) is an actual or prospective bidder and (2) possesses the requisite direct economic interest" and treating prejudice as part of "direct economic interest" inquiry).

[5] TRAX urges that because this is a pre-award protest, the Court should apply the more lenient "non-trivial competitive injury" standing prerequisite set forth in <u>Weeks Marine</u>. See Pl.'s Reply in Supp. of its MJAR & Opp. to Def.'s Cross-Mot. for J. on the Admin. R. ("Pl.'s Reply") at 18 & n.4, ECF No. 23. But in <u>Weeks Marine</u>, the court of appeals applied that standard as an exception to the usual "but for" analysis because there was no "factual foundation" for such an analysis where proposals had not yet been submitted or evaluated. 575 F.3d at 1361–62 (internal quotation marks and citations omitted). In this case, by contrast, the protest was filed after TRAX both submitted a proposal and was eliminated from the competition based on certain evaluated deficiencies in that proposal. The original proposal and the Army's evaluation provide a sufficient factual predicate to determine: 1) whether TRAX's proposal was eliminated before or after the alleged change in contractual requirements that would have triggered an obligation to amend the Solicitation under FAR 15.206(a); and 2) whether, in any event, TRAX would have submitted a proposal with the same or similar deficiencies had the government amended the Solicitation as TRAX contends was required. The record, in other words, is sufficient to determine whether TRAX had a substantial chance at award but for the Army's alleged error. There is therefore an "adequate factual predicate" for applying a "but for" analysis. <u>Orion Tech.</u>, 704 F.3d at 1349.

response to the amendment, TRAX cannot demonstrate that it would have had a substantial chance of securing the award but for the legal error it alleges.

Thus, under FAR 15.206(a), the obligation to amend a solicitation is triggered "[w]hen, either before or after receipt of proposals, the Government changes its requirements or terms and conditions." But TRAX does not allege—much less prove—that the Army changed its "requirements" (i.e., arrived at a new forecast of hours that would be required to perform the contract ) before September 18, 2018.

In fact, the record shows that the agency was examining the issue through the fall of 2018 as part of the annual budget cycle. For instance, TRAX points to the fact that Ms. Way was tasked with a "Workforce Position Review" in late 2018 as part of its argument that the contract requirements changed. See Pl.'s MJAR at 6, 18. This review—which was part of the agency's deliberative process and not a final decision—occurred in November, well after TRAX was eliminated from the competition on September 18. See AR Tab 41c at 9591 (Ms. Way's memorandum for the record recounting that she was tasked with the Workforce Position Review on November 2).[6] TRAX also directs the Court to a document entitled "FY19 Budget" in support of its position that the agency's requirements changed. Pl.'s MJAR at 7, 18. This document, too, dates to November 2018, well after TRAX's elimination. See id. (citing AR Tab 49 at 9842, 9844).

The Court finds it significant that TRAX itself has consistently declined to identify when, in its view, the agency's obligation to amend the Solicitation was triggered. Instead, in its briefs and in response to the Court's inquiries at oral argument, TRAX has characterized the changes in the agency's forecast as "incremental" ones, which it claims "commenced in the four months prior to TRAX's elimination." Pl.'s Reply at 3; see also Hr'g at 2:03:50–04:30. It is TRAX's burden to establish its standing, including prejudice. CliniComp, 904 F.3d at 1358. In the Court's view, TRAX's vague "incremental change" theory is insufficient to do so, particularly given the other evidence of record which shows that the Army was still analyzing its needs in the months after TRAX was eliminated from the competition.

Further, and in any event, even were the Court to assume that the agency's forecast changed before TRAX was eliminated from the competitive range, it would still find that TRAX has not established prejudice for standing purposes. The reason the agency excluded TRAX from the competitive range was because it proposed to use a workforce with a part-time to full-time employee ratio of [***] percent to [***] percent, which the agency concluded posed an unacceptable risk to contract performance, for the reasons set forth above.

Therefore, to establish its standing TRAX must show that, had the agency amended the Solicitation to reflect a reduction in the hours set forth in Exhibit T, TRAX would have submitted a proposal that did not rely so heavily on a part-time workforce whose fringe benefits

---

[6] Although Ms. Way's memorandum references the date "2 November 2019," the Court infers that this was a typographical error and that Ms. Way was referring to November 2018, as she did elsewhere in the same document. AR Tab 41c at 9591.

14

were limited. Based on the record before it, the Court is not persuaded that had the agency amended the Solicitation in the manner TRAX urges was required, TRAX would have submitted a proposal that was not similarly deficient.

To the contrary, TRAX made several statements in its proposal which show that it understood that the labor hours listed in Exhibit T might not reflect the actual labor hours required to perform the contract. In fact, it advertised that its staffing approach was designed to address fluctuations in staffing. It observed that its "current contract staffing [was] much less than the total scope described in Exhibit T." AR Tab 11b at 5381. It predicted that "actual staffing" would be determined based on "the total available reimbursable and institutional budgets, Spend Plans, and tasks issued through PSCs immediately after contract award." Id. It further acknowledged that based on its "current experience" it understood "that available institutional funding and reimbursable test programs will ultimately dictate our overall staffing approach and will constantly evolve." Id. at 5479. For these reasons, TRAX emphasized that a selling point of its proposal was that its "overall management and administrative staff is fully scalable and adaptable to the actual staffing level of the contract and [would] be adjusted accordingly as the contract grows or diminishes to control institutional cost." Id. at 5381 (emphasis supplied).

TRAX further touted the merits of its use of part-time labor by stating that its staffing approach had been used successfully at other installations. See AR Tab 15a at 6145 (citing use of "a similar mix of part-time to full-time employees" at Fort Hood and Yuma Proving Ground); AR Tab 15c at 6158–59 (citing successful use of staffing approach at White Sands, Yuma, and Fort Hood). This further suggests that the fundamental details of its approach (which the Army found deficient) were not dependent upon the labor hours reflected in Exhibit T.

TRAX made similar statements during its first GAO protest. It observed that it "was well aware that the incumbent staffing and scope of work actually differed markedly from the data provided in the [Solicitation]." AR Tab 23 at 6253. It also described Exhibit T's staffing requirements as a "fictional" or "artificial" staffing baseline that "attempt[ed] to create a level playing field." Id. at 6243, 6248, 6250, 6265. In letters to the Army, TRAX also said Exhibit T was a "baseline" and that the Solicitation provided no workload data or projections. AR Tab 15a at 6146; AR Tab 15c at 6156.

TRAX also recognized the potential for future staffing reductions in its responses to the government's August 2018 correspondence. It affirmed its proposed part-time to full-time ratio and informed the government that its "management solution [took] into consideration the current and future budget reductions and limitations" for various contract customers. AR Tab 15a at 6145. TRAX further posited that its minimal-overtime approach was "viable" and was "reflective of the current WSMR MSS budget-constrained environment." Id. at 6146. As a final example, TRAX reiterated that its proposal reflected the labor hours shown in Exhibit T, which was a "baseline" and was "representative of the previous contract and [did] not represent a forecast forward." Id.

To be sure, the Soules Declaration contains a sentence asserting that TRAX "would have taken a different approach to its proposed staffing and Mission Capability proposal based on significantly fewer FTEs consistent with these new requirements." Soules Decl. ¶ 10; see also

15

Compl. ¶ 94; Pl.'s MJAR at 20–21. But Mr. Soules does not even attempt to explain what the "different approach" would have entailed. And the Court has no basis for inferring that the "different approach" would have involved a staffing strategy that did not rely heavily on a part-time workforce. Indeed, such an inference would be inconsistent with the other evidence in the record, described above. That evidence shows that TRAX was acutely aware of the constrained-budget environment and the possibility of further budget cuts related to the successor MSS contract, that it proposed a heavily part-time workforce to cut costs, and that it expected that its approach would be adaptable to the overall level of effort required.

The Court finds based on the record that TRAX has not shown that, had the Army issued an amendment as was allegedly required, TRAX would have submitted a proposal free from the deficiencies that caused its exclusion from the competitive range. In other words, TRAX has not shown that but for the alleged procurement error, it would have had a substantial chance of securing the contract award.

For all of the above reasons, the Court finds that TRAX lacks standing to bring its FAR 15.206(a) claim. The Court, therefore, lacks subject-matter jurisdiction over the claim and must dismiss it without prejudice.

### III. TRAX Also Lacks Standing to Pursue Its PIA Claim

TRAX's second ground for protest is based on what it alleges was a failure of the agency to conduct a reasonable investigation of its allegation of a potential violation of the Procurement Integrity Act, as required by FAR 3.104-7. It contends that the CO's investigation was inadequate because, among other things: (1) he did not review all 6,600 documents that Ms. Way moved to her laptop from the accounting folder that was on the Z-Drive, but instead only reviewed those contained in the subfolders entitled "Contract Functional Review" and "Resumes"; (2) he failed to determine at the time of the investigation whether any of the information uploaded to the Z-Drive was "bid or proposal" information within the meaning of 41 U.S.C. § 2101 (i.e., the PIA); and (3) his conclusion that any disclosure that occurred could not have affected the procurement was not supported by the record. TRAX also contends that the CO violated FAR 3.104-7(a)(1) because he did not provide complete and accurate information to the Chief of Contracting.

The Court assumes for purposes of determining its jurisdiction that the agency committed the violations of the PIA alleged by TRAX. It concludes, however, that whether it applies the "but-for" test (i.e., substantial chance) or the "non-trivial competitive injury" standard of prejudice, TRAX has not established its standing to pursue its PIA claim.

Thus, as counsel for TRAX conceded at oral argument, to establish injury for purposes of standing, TRAX must show, at a minimum, that the alleged PIA violation occurred before it was eliminated from the competition. Hr'g at 2:51:20–53:10. The record shows, however, that to the extent that the uploading of TRAX's files resulted in a PIA violation, such violation could not have occurred until after TRAX was excluded from the competitive range. Not only was TRAX no longer in the competition by the time the files were uploaded but, in addition, all of the offerors remaining in the competition had already submitted their final proposal revisions ("FPRs").

In the statement she provided during the CO's PIA inquiry, Ms. Way stated that she uploaded the files at issue to the Z-Drive on November 26, 2018. AR Tab 41c at 9591. She explained that on that day she was in a hurry and she placed the files into a newly created "Contract Functional Review" folder in connection with a briefing she was preparing as part of her assignment to develop a Workforce Position Review. Id. at 9591–92; AR Tab 33 at 9395. Ms. Way noted that it was not her general practice to place proprietary data on the Z-Drive. AR Tab 33 at 9395. She also assured the participants on the January conference call that she had never uploaded TRAX proprietary data to the Z-Drive before or after November 26. Id.

TRAX was eliminated from the competition on September 18, 2018, more than two months before Ms. Way had uploaded the files at issue to the Z-Drive. In addition, the three remaining offerors submitted their FPRs on November 25 and the morning of November 26, before Ms. Way created the Contract Functional Review folder at 12:43 PM MST on the same day. See AR Tab 41b at 9578 (explaining details of submission of FPRs in relation to date and time that Ms. Way created the new Z-Drive folder and uploaded the subject files to the folder).

Although TRAX challenges Ms. Way's statement that the data at issue was uploaded on November 26, and not before, it cites no evidence that calls into question either Ms. Way's recollection or her credibility. At best, TRAX contends that—in light of the "modified date" included with each file's metadata—it is impossible to rule out that at least some of the files at issue could have been uploaded before that date. Pl.'s MJAR at 30–34. But this speculation does not suffice to rebut Ms. Way's unequivocal statement that no TRAX proprietary data was uploaded before or after the afternoon of November 26, 2018. See Am-Pro Prot. Agency, Inc. v. United States, 281 F.3d 1234, 1239–40 (Fed. Cir. 2002) (holding that the "presumption that government officials act in good faith" can only be overcome by clear and convincing evidence).

In short, the Court concludes that the data in question was not on the Z-Drive until after TRAX was eliminated from the competition and the final three offerors had submitted their FPRs. TRAX therefore cannot establish that—even assuming there was a PIA violation—it suffered any resulting competitive injury, let alone a "non-trivial" one. Its PIA claim must therefore also be dismissed for lack of subject-matter jurisdiction.

## CONCLUSION

Based on the foregoing, TRAX's complaint is **DISMISSED without prejudice** for lack of subject-matter jurisdiction. In addition:

1. TRAX's motion for judgment on the administrative record (ECF No. 19) is **DENIED**.

2. The government's cross-motion for judgment on the administrative record (ECF No. 20) is **DENIED as moot**.

3. TRAX's motion to compel completion and/or supplementation of the administrative record (ECF No. 25) is **GRANTED-IN-PART** and **DENIED-IN-PART**.

4. The government's motion to strike materials attached to TRAX's complaint and MJAR (ECF No. 20) is **GRANTED-IN-PART** and **DENIED-IN-PART**.

5. The government's motion to strike materials attached to TRAX's reply in support of its MJAR (ECF No. 28) is **GRANTED**.

The Clerk of the Court is directed to enter judgment accordingly. Each party shall bear its own costs.

**IT IS SO ORDERED.**

s/ Elaine D. Kaplan
ELAINE D. KAPLAN
Judge
